**SOUTHERN RAILWAY COMPANY,**
**Plaintiff,**

**v.**

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

**Civ. A. No. 112–69–R.**

United States District Court
E. D. Virginia,
Richmond Division.

Argued Sept. 16, 1969.

Decided Oct. 1, 1969.

---

Michael J. Henke, Washington, D. C. (H. Merrill Pasco, Robert P. Buford, Richmond, Va., Henry P. Sailer, Duncan B. Phillips, Washington, D. C., on the brief), for plaintiff.

Jerome Nelson, Counsel, Interstate Commission Commission (Richard W. McLaren, Asst. Atty. Gen., of the U. S., Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, John H. D. Wigger, Atty., Dept. of Justice, C. Vernon Spratley, Jr., U. S. Atty., Richmond, Va., Rod Sager, Asst. U. S. Atty.), for defendants.

R. Harvey Chappell, Jr., Richmond, Va. (Richard T. Cubbage, Richard M. Gleason, Chicago, Ill., John E. McCullough, W. W. Dalton, St. Louis, Mo., on the brief), for intervening defendants St. Louis-San Francisco Railway Co., and Chicago, Burlington & Quincy Railroad Co.

L. E. Torinus, St. Paul, Minn., J. I. Finsness, Fargo, N. D. (Smith R. Brittingham, Jr., Louis T. Duerinck, Martin L. Cassell, Chicago, Ill., Louis A. Harris, St. Paul, Minn., Charles H. Clay, Minneapolis, Minn., Charles W. Burkett, San Francisco, Cal., Robert B. Batchelder, Omaha, Neb., R. Colston Christian, George R. Humrickhouse, Richmond, Va., Charles O. Ham, Jr., Oklahoma City, Okl., on the brief), for other intervenors.

Before BRYAN, Circuit Judge, and MacKENZIE and MERHIGE, District Judges.

ALBERT V. BRYAN, Circuit Judge:

An Interstate Commerce Commission report and order [1] is here attacked by the Southern Railway Company. The Commission had held itself powerless to allow Southern to recover compensation from the Chicago, Burlington & Quincy Railroad Company (Burlington) and the St. Louis-San Francisco Railway Company (Frisco) for delivering to them empty boxcars as directed by the Commission in relief of an emergency car shortage. We decline to disturb this ruling.

The directions were issued under section 1(15) of the Interstate Commerce Act, 49 U.S.C.A. § 1(15), which provides:

"Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: * * * (b) to make such just and reasonable directions with respect to car services without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, *upon such terms of compensation* as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; * * * *". (Accent added.)

The three car directions in suit were fully complied with; their validity is unquestioned. The first required the Seaboard Air Line Railroad Company to deliver to Southern each week, from January 30 to March 31, 1966, 350 empty boxcars of any ownership, except Canadian, and Southern to move them, empty, over its lines and at its western termini to deliver them to Burlington. The second direction, effective between February 3 and March 31, 1966 required Southern to deliver weekly to Frisco 350 cars of similar type. The third direction required Seaboard to deliver to Southern each week, between April 4 and May 24, 1966, 175 of such cars, and

1. 332 ICC 554. Served November 30, 1968, the order in the case appears on the Commission's Docket as No. 34731 (Sub-No. 2), In the Matter of Compensation for Transportation Service Performed Pursuant to Pfahler's Car Distribution Directions.

Southern to deliver the same number to Burlington.

On receiving the directions Southern immediately notified Frisco and Burlington that while it would comply, it would demand compensation of them for this service. The latter roads denied the asserted obligation. Whereupon Southern filed petitions against them, asking the Commission to fix the compensation and order its payment under section 1(15) of the Act. Before action thereon, a third petition was filed by Southern. It prayed for a declaratory judgment, under section 5(d) of the Administrative Procedure Act, 5 U.S.C.A. § 554(e), to the effect that the Commission was empowered by 1(15) to order payment.

The jurisdiction of the Commission to enter a declaratory judgment is not doubted, and there is no fight on the facts. However, Frisco and Burlington, together with the intervening nine railroads and several State public service agencies, oppose Southern's claim on the ground that under 1(15) the Commission cannot award compensation to a non-owner for a redistribution of other carriers' empty boxcars.

Before discussing this central issue, we dispose of a preliminary defense proffered by the respondents. In this they call attention to the American Association of Railroads (AAR) Car Service and Per Diem Agreement, to which all the carriers in this case are signatories, providing for arbitration of differences between them. The significance accorded the agreement is that it undermines Southern's reliance on section 1(15) in that it removes the "disagreement" demanded by the statute as a condition precedent to the Commission's jurisdiction. Resolution of the point was not attempted by the Commission. Instead it concluded that "[t]his, however, is a matter for the courts to decide. The rights and obligations assumed by the Southern, respondents, intervenors, and other subscribers present a judicial question for judicial determination by the courts, not the Commis-

sion". [Citations omitted.] Nevertheless, for determination of the cause, the Commission assumed the disagreement envisioned by the statute.

 Burlington and Frisco except to the Commission's declination to hold the agreement to be a covenant by Southern to arbitrate its claim. Of course, an arbitration agreement is an agreement of settlement, and if established here it would ipso facto preclude the Commission's entertainment of Southern's claim. Since the Commission did not rule on the point, as a reviewing court we hesitate to pass upon it. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Moreover, we see no necessity to do so.

The course pursued by the Commission dispatched decision. No matter the effect of the agreement, the ultimate answer lay in ascertaining the Commission's power in the premises. For expedition, it assumed arguendo the correctness of Southern's assertion of a disagreement. There was wisdom in this procedure. Had the Commission found the agreement not to bind Southern to arbitration, or otherwise foreclose resort to the Commission, it would still have been obliged to resolve the question of its right to award compensation. If it determined that the agreement ousted any suggestion of disagreement, then a remand to the arbitrators would have been necessary, with the possibility of an appeal on the arbitrability of the issue. Without harm to any party, these lurking delays were avoided by the Commission.

Returning to the central issue—Southern's assertion that the Commission has the power to compensate it—we agree with the Commission that the facts did not fulfill the statutory prerequisites to the invocation by the Commission of its compensation powers. To

be recalled throughout, the grievance immediately alleged by Southern is not the Commission's refusal to compensate it, but rather its disavowal of any authorization in the statute to do so. Had the contrary been declared, the entitlement and quantum of compensation would be adjudged on Southern's first two petitions. Hence we do not explore whether Southern is due compensation. Our study is the Commission's power to consider compensation in the circumstances.

Section 1(15) aims to relieve an emergency "shortage" of railroad equipment hurtful to "the interest of the public and the commerce of the people". It seeks needful utilization of all transportation facilities. An inadequacy in the number of boxcars available to shippers in the West admittedly existed when the directions in suit were promulgated. A preface to each of them is this finding by the Commission:

> *"It appearing,* That in the opinion of the Commission there exists a shortage of equipment particularly of plain boxcars, in certain sections of the country of such a nature as to create an emergency requiring immediate action; that existing carrier rules, regulations, and practices with respect to the use, supply, control, movement, distribution, exchange, interchange, and return of cars to the railroads owning such cars are ineffective; that car service will be promoted in the interest of the public through the issuance of car distribution directions for the location or relocation of empty cars; that notice and public procedure are impractical and contrary to the public interest under the circumstances; and that good cause therefor exists for the entry of this order upon less than 30 days' notice: * * * * "

True, on its face the statute seemingly supports Southern. It moved the cars at its expense over its trackage and by its crews and locomotives, the cost was enormous, the carriers disagreed on compensation and, arguably, in that contingency 1(15) invests the Commission with jurisdiction to provide reimbursements. Another apparent inequity is that the cars were not, except infrequently, Southern's and Southern was not permitted to load even the few that were. Nonetheless, set in its proper place in the Act, the section is not so interpretable.

Settlement of the divergence entails consideration of section 1(14) (a) of the Commerce Act stipulating non-emergency powers of the Commission. It furnishes, we think, authorization for an order for relocation of cars under normal conditions of the character of the direction now in discussion. The apposite part of 1(14) follows:

> "The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle now owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for non-observance of such rules, regulations, or practices."

■ If the movements now considered had been in pursuance of a 1(14) order, no compensation would have been due the mover. The reason is that "for the use" of cars the section bestows upon the Commission the right to allow compensation of an owner by a non-owner but *not* of a non-owner by an owner. The hauling of even an empty car by a non-owner to return it to the owner is, in railroad parlance, a use of the car by the non-owner.

■ In refusing Southern compensation for the emergency-directed movements, the Commission observed, and we concur:

> "It is, however, inconceivable that the Congress would allow different terms

of compensation under the two sections, with a broader compensation applying during periods of emergency, thus encouraging the creation of emergencies by any carriers who might be inclined to fall behind in fulfilling their responsibilities in regard to the maintenance of a national car fleet. * * * "

So concluding, the Commission superimposed 1(14) upon 1(15), and thus restricted the compensation permitted under 1(15) to the *owner* of the car for its use, disallowing compensation to the non-owner for moving it.

Rejoining, Southern challenges this matching of the two sections. First, it underscores emergency as the dominant factor of 1(15). In this consideration, it is said, Congress broadened the powers of the Commission beyond those it possessed in usual circumstances; it thought that the exigencies presupposed in 1(15) called for extraordinary authority. This intent, we are told, is evidenced by the authorization of "directions", rather than merely "rules, regulations, and practices", products of conventional action under 1(14). Moreover, "car service" and not "use" is the standard for computing compensation, suggesting a purpose not to tie the payments down to the utilization of a "locomotive, car or other vehicle", as does 1(14). The unrestrained language of 1(15) permitting the Commission to sweep aside "any or all rules, regulations or practices" is alluded to as also exampling Southern's contention that 1(15) spells out a widened concept of Commission power, under which it may reward a carrier commanded into action by a directive under the statute.

Southern insists, further, that the phrasing of 1(14) teaches that it is addressed only to general operations and not to particularized movements as here. In support the railroad notes that the plenary procedures stipulated in 1(14) demonstrate its unfitness in an emergency. It is suggested, as well, that if 1(15) contained only the compensatory provisions of 1(14), the recitation in 1(15) of compensatory provisions was an inexplicable redundancy.

Despite its plausibility, Southern's plea is not convincing. Viewed comprehensively, the primary intendment of 1(15) is to enable the Commission at once to remove impediments to railroad "service in the interest of the public and the commerce of the people". It merely put spring and suppleness in the Commission's muscles, unbinding them from procedural encumbrances. In respect to compensation of the sort now asked by Southern, we conclude that 1(15) does not augment the power conferred by 1(14).

Enlargement or strengthening of Commission powers does not automatically expand its right to order compensation for services performed by railroads under the exercise of the added powers. In Palmer v. United States, 75 F.Supp. 63, 67 (D.D.C.1947), Judge Prettyman with enviable clarity explains that the "specific power to fix compensations for the use of cars is not coextensive with the general power to regulate the use of cars." [2]

In our judgment the variance between the terms of 1(14) and 1(15) is not of such significance, in the facts of this case, as to justify a departure from 1(14) in calculating the claimed compensation under 1(15). The terminology of 1(15) is simply prescriptive of emergency action, that of 1(14) of conventional procedures. This deviation in words is thus fully accounted for, and refutes the attempt to infer an alteration in the approach to compensation. Likewise, the inclusion of the compensation clause in 1(15) is not a redundancy of the 1(14) compensation stipulation. There might be "directions" under 1(15) embracing a service which is in a category other than distribution of cars and to which the authority to allow com-

2. The opinion is enlightening generally on Commission's power to impose charges upon one carrier for the use of another's car.

pensation could be extended. This possibility, semble, is intimated in section 1(10) of the Act by including in the definition of "car service", "the supply of trains" in addition to the use, movement, return of locomotives and cars. We find nothing determinative on the point in the legislative history of the enactment cited to us.

The argument that 1(14) is inapt for emergency use, and so should not be to any extent read into the construction of 1(15), misses the mark. It does not deny the power under 1(14) but only distinguishes 1(15) and 1(14) on a practical basis, as to when the one or the other would best solve the problem. The right to act in an emergency does not negate the right to act similarly in normal conditions. Furthermore, it appears that the Commission could, if an emergency condition so warranted, promulgate directions under section 1(15) of general application to *all* railroads as it is empowered to do under section 1(14) in non-emergency situations. See United States v. Thompson, 58 F.Supp. 213 (E.D.Mo.1944).

■ Of especial weight in favor of the Commission's decree is the mutual acknowledgment that since the enactment of 1(15)—a period of more than 50 years—no assertion of compensation has ever been presented by a carrier for services akin to those with which we are now concerned. Absence of any claim in the face of numerous 1(15) orders is sturdy precedent against the rightfulness of Southern's position. This is proof aplenty of railroad acceptance of the Commission's interpretation. While not conclusive of the effect of a statute, such acquiescence is highly persuasive of the meaning of the statute's words. See Order of Ry. Conductors of America v. Swan, 329 U.S. 520, 525, 67 S.Ct. 405, 91 L.Ed. 471 (1947); Hertz Corp. v. United States, 268 F.2d 604, 607 (3 Cir. 1959), affirmed 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960); Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co., 137 F.2d 871, 880 (6 Cir. 1943), cert. denied, 320 U.S. 800, 64 S.Ct. 431, 88 L.Ed. 483.

■ Refusal of the compensation claimed is finally framed as an unconstitutional deprivation. The charge is that requiring the movements of Southern without recompense burdens it for the benefit of other carriers and not of itself. While it is not clear whether Southern has hedged itself against the potential outlays of directions, or does not profit at all from these movements, the Commission has satisfactorily anticipated this contention:

"Petitioner claims that the Burlington and Frisco received benefits as a result of the * * * car directives while petitioner incurred only costs. We do not dispute the fact that petitioner may have incurred expenses in complying with the * * * car directives. We do, however, disagree with the premise that the Burlington and Frisco received benefits for which they must render an accounting. These directives were made to 'best promote the service in the interest of the public and the commerce of the people.' No other beneficiaries are mentioned in section 1(15) (b) and no other beneficiaries were intended by the * * * car directives.

"Southern's claims of constitutional infirmities of such construction, that, unless it is compensated in the manner it seeks for the empty car movements performed by it in obedience to Commission car service directions, it will have been deprived of its property without due process, are insubstantial. The lack of compensation for compliance with the lawful orders does not raise the constitutional issue of taking of property without compensation. *Railroads historically move empty cars that have entered the national car fleet without compensation.*

"It is not altogether clear that Southern has not been compensated for such movements. *Southern's established rate structure includes an element of empty returns.*

"It is assumed that divisions of revenue derived from transporting loaded cars compensate for the movement of empties. The requirement that railroads in periods of emergency conduct their operations in the same manner as is the practice in more normal times violates no constitution prohibition. * * *" (Accent added and footnotes omitted.)

█ In refining 1(15), and even assuming it might be open to a different distillation, we adhere to the practical prescription that "great deference" should be accorded "the interpretation given the statute by the * * * agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). So analyzing the conflict, we adopt the assay of the Commission "that the compensation referred to in section 1(15) (b) relates only to compensation for use by one carrier of instrumentalities of transportation owned by another carrier." This résumé emphasizes that the statute does not tolerate consideration of payment by the transferee to the transferor for hauling in the circumstances here.

An order affirming the Commission and dismissing the petition to this court will now be entered.